IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
PARALLAX HEALTH SCIENCES, INC.,

        Plaintiff,

   - against -                      Index No.: 1:20-cv-02375 (LGS)

EMA FINANCIAL, LLC

        Defendant.
---------------------------------------------------------X

# COMPLAINT

Plaintiff Parallax Health Sciences, Inc. ("Plaintiff" or "Parallax") by their undersigned counsel, as and for its Complaint against defendant EMA Financial, LLC, allege on knowledge as to themselves and otherwise on information and belief as follows:

## Preliminary Statement

1. Parallax comes before this Court seeking to temporarily and permanently restrain EMA from effectuating transactions pursuant to loan agreements that are criminally usurious and as such, void *ab initio*. The facts are simple and straightforward: EMA drafted and has been enforcing two sets of loan documents that require Parallax to continue to pay an approximately 75% usurious interest rate on each note. While EMA had the benefit of its in-house counsel with the drafting of the loan documents, Parallax did not have counsel. The resulting loan documents demonstrates that even an experienced businessman can be fooled with legalese and misrepresentations of promises that he is unaccustomed to dealing with when working with funding sources.

2. By this action Parallax seeks, among other things, an order from this Court restraining defendant EMA from enforcing any aspect of the loan documents, including the right to acquire through conversions Parallax shares, until a subsequent order can be issued declaring the loan documents criminally usurious and void *ab initio*. Parallax also seeks an order restraining EMA from transferring, selling, assignment or otherwise disposing of any shares of Parallax stock it obtained pursuant to the loan documents until a decision on the merits has been issued.

3. This case involves a scheme to (1) defraud Parallax into selling convertible preferred stock to the EMA and (2) EMA's act to manipulate downward the stock price of Parallax in order to profit from the price decline and to take advantage of increased conversion rates from a criminally usurious and toxic lending agreement resulting from the manipulation. This scheme has injured Parallax and is in violation of federal and state law.

**Parties**

4. Parallax is a corporation duly organized under the laws of the state of Nevada, having is principal place of business and headquarters located at 28 West 36th Street, 8th Floor, New York, New York. Parallax also maintains a small office in Santa Monica, California.

5. EMA is a limited liability company formed under the laws of the State of Delaware, having its principal place of business and headquarters located at 40 Wall Street, New York, New York.

**Jurisdiction and Venue**

6. Jurisdiction arises under 28 U.S.C. § 1331, and supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in this District pursuant to 27 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, a substantial part of the property which is subject to this action is situated.

### Facts Common To All Causes of Action

8.      EMA profited from declines in the stock price of Parallax financed because of the manipulation, which creates increased shares for EMA's sole benefit on conversion as EMA receives additional shares if the stock price of the financed company, in this instant Parallax, declines. All of this was effectuated through the use of criminally usurious loan documents.

9.      EMA manipulated the price downward with the stock obtained from the conversion at a substantially lower price, profiting enormously from the difference between the price at which the stock was sold short and the price at conversion, and use the stock from the conversion to thereafter drive the price still lower, a "death spiral".

10.     These provisions give EMA an economic incentive or motive to unlawfully drive down the stock price of targeted companies in which they "invest." The immediate and aggressive selling and the use of shares obtained in later conversions by EMA give them the opportunity to artificially drive down the price of company stock, by dumping the stock, while the convertible aspect of the transaction gives the defendants the economic motive to manipulate the price of the stock, because a lower stock price economically benefits EMA through the use of conversions with the criminally usurious loan documents.

11.     This case involves an example of this unlawful scheme, carried out against Parallax, and which has injured both Parallax and its shareholders by artificially depressing the value of the stock. As alleged further below, the EMA defrauded Parallax into providing convertible preferred stock to them, and manipulated Parallax stock price down, to force Parallax

to convert even larger amounts of additional shares to EMA. In order to place the scheme in context, some background is necessary.

12. Parallax is a leading-edge technology, outcome-driven telehealth company incorporated in Nevada with its headquarters in New York, New York. The company's products and offerings capitalize on the digital transformation in healthcare for improved patient compliance, diagnosis and treatment, and support healthcare system cost savings and efficiencies. Parallax is a public company, with its stock offered on the OTCQB Exchange under the symbol "PRLX".

13. In 2018, Parallax was seeking an infusion of funds on a short-term basis, and was introduced to EMA. EMA touts itself on its website as private investment firm focused on providing creative financing solutions for public and private companies. Parallax's primary contact with EMA was Byron Campos, and beginning in the last week of January, 2019, a series of emails and telephone conversations were exchanged between Mr. Campos on behalf of EMA and Mr. Arena on behalf of Parallax as it related to a potential funding partnership between the parties.

14. In the first instance Mr. Campos requested certain information from Parallax in the form of a questionnaire that was sent to Mr. Arena, completed and returned to EMA. Upon receipt of the completed questionnaire Mr. Campos and the EMA team conducted additional due diligence on Parallax, and as a result would request additional information relating to Parallax, including information relating to a raise of funds by Parallax. After conducting its due diligence Mr. Campos commented in the end of January there were "a number of concerns, such as debt, legal proceedings and poor financials. With that said, I think we may still be able to do something here."

15. Notwithstanding such statements, over the course of the next month (January through February 2019) Mr. Campos directly, and through a third-party introduction by Vik Grover, continued to solicit business from Mr. Arena and Parallax indicating to Mr. Arena he "really wanted to make something work." This solicitation took place through emails and telephone.

16. In the course of conversations between Mr. Arena and Mr. Campos, Mr. Arena made it clear to Mr. Campos that, like other funding agreements entered into by Parallax with funding parties, Parallax would pay a competitive interest rate as well as provide EMA with the ability to have such loan paid back through a deeply discounted share conversion.

17. Mr. Arena thereafter informed Mr. Campos that there had to be caution associated with the sale of shares received in the conversions because the trading volume of the company was not large and any large sale of converted shares would have a disastrous effect on the company. Mr. Campos agreed no such sale would take place.

18. To provide additional consideration for the loan, Parallax agreed to provide a warrant, exercisable at $.15, for 300,000 shares of Parallax stock.

19. Based upon those conversations, Mr. Arena on behalf of Parallax forwarded to Mr. Campos at EMA a series of documents associated with the form of transaction that was proposed, to wit, a securities purchase agreement, a convertible note (or debenture), a warrant as further consideration for the loan as well as additional documentation necessary for the loan transaction to be effectuated.

20. Mr. Arena relied upon the statements of Mr. Campos, and such was the cause to induce Parallax to move forward with funding from EMA.

21. On or about January 30, 2019, a term sheet was provided by Mr. Campos to Mr. Arena. Upon reviewing the same Mr. Arena noted that the term sheet contained a pre-payment penalty that was not discussed, as well as a limited time for any such pre-payment.

22. Mr. Arena addressed this issue of concern with Mr. Campos, informing Mr. Campos Parallax did not want to be hamstrung by such a clause if it has the opportunity to extinguish its debt.

23. In the course of a telephone call on January 30, 2019, when addressing this point, Mr. Campos told Mr. Arena that such clauses are included in all of EMA's loan documents, however, told Mr. Arena not to be concerned with the clause because EMA wants to create a relationship with Parallax to be its funding source, and will work with the Parallax should the company wish to pay off the loan prior to the maturity date.

24. Mr. Campos was aware from the January 30, 2019, conversation that Mr. Arena was relying upon such statement, and such statement was the cause to induce Parallax to utilize EMA as a funding source and move forward with the lending documents.

25. Initially Parallax forwarded to EMA documentation it had utilized with prior funding sources. Mr. Campos rejected these documents, stating EMA would only utilizing its documentation.

26. Soon thereafter Mr. Arena would be introduced to Jamie Beitler from EMA who, on February 27, 2019, forwarded EMA's documentation required for the transaction, including the purchase agreement, convertible promissory note, a warrant for 300,000 shares, and various other documents EMA necessary for the funding of the agreed upon $111,000 loan.

27. Mr. Arena, not an attorney, received the aforementioned documents in the afternoon of February 27, 2019, and turned them around with comments for revisions the following morning. EMA was utilizing its in-house counsel to approve and edit the documents.

28. A week later the negotiations ended and documents for a $111,000 loan from EMA to Parallax were signed. Those documents included a 12% Convertible Note ("February Note"), a Purchase Agreement that tied in the use of Parallax shares, a warrant for the issuance of 300,000 shares of Parallax at a strike price of $.15, wire instructions and an irrevocable transfer agent instruction.

29. The February Note was for a nine-month term. The purchase agreement was necessary because the transactions were created in a manner in which EMA had the to convert the principal, interest and any other amount due into free trading common stock of Parallax.

30. Unbeknownst to Parallax, the February Note in conjunction with the purchase agreement were fraught with liquidated damages and penalty provisions to considerably benefit the lender. For example, if the requested conversion of shares were not effectuated on a timely basis, Parallax would be penalized $250 per day for each day over the set deadline, with the balance of penalty permitted to be added to the principal balance.

31. Additionally, as set forth in article three of the February Note, there were eighteen different forms of default that, if they took place, would provide EMA with an extravagant windfall of riches at the detriment of Parallax that had no reasonable relationship to the amount of the principal loan.

32. Such terms included a default payment of 200% of the balance due, plus interest at 24%, or, depending what was greater, a required conversion of shares of what was defined as a "default sum" with a multiplier creating a windfall for EMA.

33. Neither option had any relationship to the loan amount or any reasonable damages provision, but rather, was a straightforward liquidated damages provision.

34. In addition to the 12% interest applied to the nine-month loan, EMA received the aforementioned warrant for the issuance of 300,000 Parallax shares at the strike price of $.15; this consideration carried an exercise value $45,000.

35. After the documents were fully executed and exchanged, EMA funded Parallax, but not the $111,000 dollar value as set forth in the February Note, but rather because EMA discounted the loan by $6,660 based upon an Original Issue Discount of the loan. Additional, purported legal fees were deducted, and on March 11, 2019, EMA wired Parallax $99,900.

36. The proper calculation of the interest rate must include not only the $45,000 value of the warrant, but also the $6,660 Original Issue Discount applied to the February Note. This calculation adds together the $9,990 derived from the original interest rate over the nine-month term. From there, to calculate the interest rate the cumulative dollar amount of $61,650 is divided into the $111,000 principal amount, applying the nine-month term, bringing the interest rate of the February Note to 74.26%.

37. In April 2019, Parallax again sought an infusion of funds, and turned to EMA. For this lending round, another $111,000 loan was effectuated on near similar terms: 12% convertible note ("April Note"), term of nine-months, and the same default and penalty terms.

38. Like the February transaction, the April transaction also contained additional consideration of a warrant for 300,000 warrants at the same $.15 strike price. However, unlike the February Note, the April Note carried with it an Original Issue Discount of $8,560 as well additional purported legal fees. Thus, on April 12, 2019, EMA only funded $99,940, but charged interest on $111,000.

39. The interest rate on the April Note is calculated in the same manner as that for the February Note. This calculation adds together the $9,990 derived from the original interest rate over the nine-month term, the $45,000 warrant value and the $8,560 discount rate. From there, to calculate the interest rate the cumulative dollar amount of $63,550 is divided into the $111,000 principal amount, applying the nine-month term, bringing the interest rate of the April Note to 75.99%.

40. The February Note and April Note (collectively the "Transactions") carry with them a criminally usurious interest rates of approximately 75%, triple the permissible rate permitted in New York.

41. The Transactions also carry with them impermissible penalty clauses that are nothing short of liquidated damages clauses that have no relationship to the value of each loan. Each note, in conjunction with the respective purchase agreements, were fraught with liquidated damages and penalty provisions to considerably benefit EMA. For example, if the requested conversion of shares were not effectuated on a timely basis, Parallax would be penalized $250 per day for each day over the set deadline, with the balance of penalty permitted to be added to the principal balance.

42. Additionally, as set forth in article three of the February Note, there were eighteen different forms of default that, if they took place, would provide EMA with an extravagant windfall of riches at the detriment of Parallax that had no reasonable relationship to the amount of the principal loan.

43. Such terms included a default payment of 200% of the balance due, plus interest at 24%, or, depending what was greater, a required conversion of shares of what was defined as a "default sum" with a multiplier creating a windfall for EMA.

44. Through the misrepresentations and criminally usurious lending agreements, EMA completed Phase One of its stock manipulation plan.

45. The misrepresentations alleged above were false and misleading when made. In making the misrepresentations alleged above, EMA acted with scienter. EMA had motive and opportunity to make false and misleading statements, because the terms of the agreement with Parallax would provide them with an economic incentive to acquire Parallax stock and manipulate its stock price for its benefit and to the detriment of not only Parallax, but other holders of Parallax stock.

46. In November, 2020, Parallax requested a pay-off of the Transactions. At this time Mr. Arena was working with Felicia Preston, holding the title of Director at EMA.

47. Initially Mr. Arena was told there would be no permissible payoff. This figure was contrary to what Mr. Campos had told Mr. Arena on January 30, 2019.

48. Mr. Arena immediately informed Ms. Preston with the position Mr. Campos stated, that such would indeed be permissible. Ms. Preston then turned course and provided Mr. Arena with a payoff figure, approximately $329,000 that was almost double what the remaining balance was at the time. This figure was nothing short of a configuration of a penalty ridden, impermissibly calculated dollar amount with no reasonable basis to the principal due at the time.

49. Mr. Arena requested a breakdown of the figure, but Ms. Preston refused to produce the same.

50. From November through the end of the year, Mr. Arena repeatedly pressed Ms. Preston for information that served as the basis for the payoff figure. Ms. Preston would fail to return calls or emails for days and weeks at a time.

51.     With the benefit of hindsight, the reason for Ms. Preston's silence became evident based upon EMA's effectuation of the very scheme it intended upon utilizing to manipulate Parallax's stock for its benefit.  First came the conversions as set forth below:

| DATE | SHARES TRANSFERRED | SHARES | PAR VALUE | COMMON | MARKET VALUE PER SHARE | CONVERSION PRICE PER SHARE |
|---|---|---|---|---|---|---|
| 01/02/20 | 01/09/20 | 400,000 | 400 | 27,600 | $ 0.0700 | $ 0.0225 |
| 01/24/20 | 01/28/20 | 400,000 | 400 | 19,600 | $ 0.0500 | $ 0.0228 |
| 02/05/20 | 02/11/20 | 400,000 | 400 | 19,600 | $ 0.0500 | $ 0.0185 |
| 02/14/20 | 02/14/20 | 1,000,000 | 1,000 | 49,000 | $ 0.0500 | $ 0.0185 |

52.     These conversions resulted in a windfall for EMA; the conversions above decreased the principal balance on the February Note by $41,580, while receiving $115,800 worth of Parallax stock.  Phase two of the scheme to effectuate the stock manipulation was in place.

53.     The third phase of the manipulation began with the steps EMA took to materially depress the Parallax stock, harming other shareholders and investors, for the sole purpose of being able to acquire an amount of shares through the Transaction documents conversion process that it would otherwise be unable to receive.

54.     From its first conversion in January 2020 through the end of February, 2020, EMA utilized shares of Parallax it should not have acquired in the first instance to effectuate several dumps, or mass sales of its Parallax stock for one sole purpose: to manipulate the stock price, driving down its value so that it may then utilize the criminally usurious lending agreements to effectuate additional conversions of Parallax shares at an exponentially decreased price, with such decrease in price caused solely by EMA's manipulation of the market to benefit itself.

55.     These transactions resulted in the depression of the price, cumulatively over the two-month period of 30% of the value of the penny stock.

56. The purpose and effect of these manipulative techniques was to artificially depress the price of Parallax stock, to the benefit of EMA and to the detriment of Parallax and the investing public. The scheme has been successful in driving down the price of Parallax stock from $.070 to $.048.

57. By the end of February EMA not only had received a windfall from its scheme, but was continuing the same by moving forward with a proposed March 3, 2020, conversion of Parallax stock to acquire an additional 1,500,000. It is not coincidental this amount equates to the approximate amount of shares EMA had previously dumped into the market forcing down the price of the stock for its newly proposed acquisition of Parallax shares.

58. What also became evident was EMA's intent to defraud Parallax by improperly increasing the amount of the principal balance as well as including fees that simply were false.

59. In the first instance, upon information and belief no legal fees were paid for any of the work so billed; and if it was paid, it was in an amount less than charged by EMA to Parallax.

60. Second, in October of 2019, Parallax wired to EMA $77,700, an amount sent from Parallax to counsel for EMA, then forwarded by counsel directly to EMA. This money was never returned.

61. In addition to the $77,700 payment, four conversions totaling approximately $39,685 were effectuated. Cumulatively, the payment and conversions totaled approximately (rounding to the dollar) $117,385.

62. A correct calculation of the payments accounting for principal and interest (assuming legal fees and costs as charged were actual) should have been as follows:

| DATE | # DAYS | PRINCIPAL 1 | PRINCIPAL BALANCE | INTEREST 1 | P & I 1 |
|---|---|---|---|---|---|
| 02/27/19 | | 111,000.00 | 111,000.00 | | |
| 03/31/19 | 32 | | 111,000.00 | 1,167.78 | 112,167.78 |
| 04/08/19 | 8 | | 222,000.00 | 291.95 | 112,459.73 |
| 06/30/19 | 83 | | 222,000.00 | 3,028.93 | 115,488.66 |
| 09/30/19 | 92 | | 222,000.00 | 3,357.37 | 118,846.03 |
| 10/30/19 | 30 | | 222,000.00 | 1,094.79 | 119,940.82 |
| 10/30/19 | 0 | (68,759.18) | 153,240.82 | (8,940.82) | 42,240.82 |
| 11/27/19 | 28 | | 153,240.82 | 388.85 | 42,629.67 |
| **12/31/19** | 34 | | 153,240.82 | 472.17 | 43,101.84 |
| 01/02/20 | 2 | | 153,240.82 | 27.77 | 43,129.62 |
| 01/02/20 | 0 | (6,485.90) | 146,754.92 | (888.79) | 35,754.93 |
| 01/08/20 | 6 | | 146,754.92 | 83.32 | 35,838.25 |
| 01/24/20 | 16 | | 146,754.92 | 188.08 | 36,026.33 |
| 01/24/20 | 0 | (7,703.19) | 139,051.73 | (271.41) | 28,051.74 |
| 02/05/20 | 12 | | 139,051.73 | 141.06 | 28,192.80 |
| 02/05/20 | 0 | (6,431.49) | 132,620.25 | (141.06) | 21,620.25 |
| 02/14/20 | 9 | | 132,620.25 | 83.00 | 21,703.25 |
| 02/14/20 | 0 | (17,683.56) | 114,936.69 | (83.00) | 3,936.69 |
| 03/11/20 | 26 | | 114,936.69 | 33.65 | 3,970.34 |
| | | | | | |
| **TOTAL** | | 3,936.69 | 114,936.69 | 33.65 | |

63.    Unfortunately, EMA, through the use of mail and emails, continued it fraudulent scheme by knowingly providing to Parallax conversion notices setting forth a balance significantly higher than permitted, and one that would provide EMA with the ability to acquire yet more shares through the scheme.

64.    These conversion notices, carried through to the transfer agent based upon an irrevocable set of instructions, was another mechanism in the scheme effectuated by EMA - - it knew full well based upon the Transactions' documents it drafted and required for the Transactions, Parallax would be unable to stop the manipulation process.

**FIRST CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

65. Parallax repeats and realleges paragraphs 1-61 as if fully set forth herein.

66. The loan documents utilized by EMA for the Transactions contain a criminally usurious rate.

67. New York law holds such usurious rate, here at approximately 75%, three times over the permissible rate, renders the underlying notes and corresponding agreements void *ab initio*.

68. As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties to this action as to whether the documents underlying the Transactions are enforceable as a matter of law.

69. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 Parallax in good faith requests the Court declare the February Note and April Note void *ab initio*, thereby precluding EMA from enforcing the same upon Parallax or its transfer agent.

**SECOND CLAIM FOR RELIEF**
**INJUNCTIVE RELIEF**

70. Parallax repeats and realleges paragraphs 1-69 as if fully set forth herein.

71. Parallax comes before this Court seeking to temporarily and permanently restrain EMA from effectuating transactions pursuant to loan agreements that are criminally usurious and as such, void *ab initio*.

72. The facts are simple and straightforward: EMA drafted and has been enforcing two sets of loan documents that require Parallax to continue to pay an approximately 75% usurious interest rate on each note.  While EMA had the benefit of its in-house counsel with the drafting of the loan documents, did not have counsel.

73. The resulting loan documents demonstrates that even an experienced businessman can be fooled with legalese and misrepresentations of promises that he is unaccustomed to dealing with when working with funding sources.

74. At the time of filing EMA, through a criminally usurious set of loan transactions has converted and received 2,200,000 shares of Parallax, and, after effectuating a series of transactions intended to depress the value of the stock, now threatens litigation to enforce a conversion of shares that would provide it with an additional 1,500,000 shares in Parallax.

75. The shares at issue are free trading shares, and once received EMA can further manipulate the market to force a subsequent conversion that would permit it to acquire shares at an intentionally depressed price, harming not only Parallax, but also anyone else holding the shares.

76. Moreover, once in possession of these free trading shares, nothing short of an order from this Court will preclude EMA from transferring, selling, pledging, granting options on, or otherwise disposing of those shares and warrants in Parallax it has maintained through the Transactions, to prevent their dispersal and to insure that those shares will be returned to the Parallax in the event that this Court eventually orders such permanent injunctive relief.

77. Monetary damages would be an inadequate remedy for Parallax if those shares were to be transferred by EMA pending final judgment in this action and irreparable harm would take place, and as such, injunctive relief is required.

78. Additionally, as set forth below, the interest rate on the two notes are criminally usurious, requiring a declaration the loans are void *ab initio*. Without the requested injunctive relief EMA will be permitted to enforce the terms of an illegal loan document to secure shares, and thereafter sell them in the open market, when it otherwise would not be permitted to do so.

79. Parallax has demonstrated irreparable harm in the absence of injunctive relief, and as referenced above, has demonstrated likelihood of success on the merits and all equities fall in favor of Parallax.

80. Parallax has no adequate remedy at law.

81. Parallax seeks an order from this Court temporarily and permanently restraining EMA from enforcing any aspect of the loan documents, including the right to acquire through conversions Parallax shares, until a subsequent order can be issued declaring the loan documents criminally usurious and void *ab initio*.

82. Parallax also seeks an order temporarily and permanently restraining EMA from transferring, selling, assignment or otherwise disposing of any shares or warrants of Parallax stock it obtained pursuant to the loan documents until a decision on the merits has been issued.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF SECTION 10(B) AND RULE 10B-5 OF THE 1934 EXCHANGE ACT
### (MANIPULATION)

83. Parallax repeats and realleges paragraphs 1-82 as if fully set forth herein.

84. Defendant EMA created, participated and gained, to the detriment of Parallax, in a scheme to defraud Parallax by manipulating the price of Parallax stock. The scheme was carried out by use of the mails and wires.

85. The scheme utilized by EMA included the use of a criminally usurious set of loan documents, and thereafter utilized those loan documents to manipulate the price of Parallax's stock by causing large volumes of stock to be sold with the intent to artificially depress the price of the stock.

86. The scheme was successful, with EMA acquiring then dumping a large volume of stock on the market in a very short time frame, artificially depressing the stock 30%. The actual dates and amounts of the sales are solely in possession of EMA.

87. EMA acted with scienter as it had the motive to engage in this scheme, because of the structure of the Transaction documents, and the opportunity to engage in this scheme, because of the stock issued by Parallax to EMA.

88. Parallax was damaged by EMA's manipulation, because EMA sold stock not for any reason other than to depress the value of it and thereafter utilize such depressed stock prices to better gain from the conversions effectuation with a criminally usurious set of loan documents.

89. This caused EMA's stock value to decline while at the same time EMA secured hundreds of thousands of Parallax shares to be issued to it, providing it further ability to continue the same scheme and harm not only Parallax but also its shareholders.

90. EMA engaged in market activity aimed at deceiving investors as to how other market participants have valued a security. The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell Parallax stock are determined by the natural interplay of supply and demand, not rigged by manipulators such as EMA. These sales by EMA sent a false signal, or active deceit to investors by creating an artificial decline in the value of the stock.

91. In addition, to secure additional shares it was not entitled to receive, EMA improperly calculated the balance due on the loans so as to have the transfer agent believe EMA maintained the right to secure additional shares.

92. EMA has violated federal securities law.

93. By reason of the foregoing Parallax has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

94. Parallax repeats and realleges paragraphs 1-93 as if fully set forth herein.

95. EMA, through its fraudulent scheme set forth above, induced Parallax to enter into the Transactional documents by withholding from Parallax the fact that the underlying Transactional documents were void *ab initio*.

96. Notwithstanding such, EMA through various conversions of the Parallax stock, received 2,200,000 shares of Parallax stock.

97. EMA was enriched and thus benefited at the expense of Parallax.  Equity and good conscience requires Parallax to recover and retain from EMA the shares EMA received pursuant to the Transaction documents.

98. These shares can be delivered by either a return of the Parallax shares, and warrants, in the possession of EMA now, and for those shares that were sold in the open market, EMA may repurchase the same for the benefit of Parallax.

99. By reason of the foregoing Parallax has been damaged in an amount to be determined at trial, together with legal fees incurred in bringing the instant action.

**CLAIM FOR RELIEF:**

**WHEREFORE**, Parallax seeks judgment against EMA as follows:

a. On the First Claim for Relief, a Declaratory Judgment Holding the Transactional loan documents are void *ab initio;*

b. On the Second Claim for Relief, an order temporarily and permanently restraining EMA from enforcing any aspect of the loan documents, including the right to acquire through

conversions Parallax shares, until a subsequent order can be issued declaring the loan documents criminally usurious and void *ab initio*; and also an order temporarily and permanently restraining EMA from transferring, selling, assignment or otherwise disposing of any shares or exercising any warrants of Parallax stock it obtained pursuant to the loan documents until a decision on the merits has been issued;

      c.      On the Third Claim for relief, an order finding EMA violated 10(b) and 10(b)(5) of the Exchange Act of 1934 and damages to be determined at trial, including, to the extent permitted, compensatory and legal fees;

      d.      On the Fourth Claim for relief, an order finding EMA was unjustly enriched by its receipt of Parallax stock, and ordering EMA to return to Parallax the full compliment of Parallax shares EMA received pursuant to the Transaction documents, including all shares and warrants of Parallax in the possession and control of EMA, and to the extent EMA is not in possession of the same, EMA shall be ordered to secure the same in the open market and provide them to Parallax, together with the payment of legal fees; and

      e.      For any other relief deem by this Court to be just, proper and in the interests of justice.

Dated: March 17, 2020

                                    **Law Offices of Barry M. Bordetsky**

                                    By:/s/ Barry Bordetsky
                                      Barry M. Bordetsky
                                      22 N. Park Place, 2nd Floor
                                      Morristown, New Jersey 07960
                                      Tel. No.: (973) 998-6596
                                      Email: barry@bordetskylaw.com