UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/24/2022
```

---------------------------------------------------------------X

PARALLAX HEALTH SCIENCES, INC.,　　　　:
　　　　　　　　　　　　　　　　　　　:　　　　20-CV-2375 (LGS) (RWL)
　　　　　　　　　　Plaintiff,　　　　　　:
　　　　　　　　　　　　　　　　　　　:　　**REPORT AND RECOMMENDATION**
　　　　　　- against -　　　　　　　　　:　　**TO LORNA G. SCHOFIELD:**
　　　　　　　　　　　　　　　　　　　:　　　　**<u>MOTION TO VACATE</u>**
EMA FINANCIAL, LLC,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendant.　　　　　　:

---------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

In 2019, Plaintiff Parallax Health Sciences, Inc. ("Parallax") and Defendant EMA Financial, LLC ("EMA") entered into two sets of loan agreements by which Parallax obtained funding in exchange for return of principal with interest, discounted stock conversion rights, and warrants to purchase additional stock. When EMA sought to enforce its conversion rights, Parallax filed this action seeking to declare the agreements void as usurious, and claiming stock manipulation in violation of federal securities laws. EMA counterclaimed for damages for Parallax's failure to honor the loan agreements.

At the outset of the case, Parallax sought preliminary injunctive relief, which the Court denied due to both lack of merit and irreparable harm. Soon after that, Parallax parted ways with its attorney and failed to retain new counsel despite knowing it was obligated to do so. By orders dated August 10, 2021, Judge Schofield granted EMA default judgment against Parallax, dismissed Parallax's complaint with prejudice, and referred the matter to me to conduct an inquest on damages with respect to EMA's counterclaims. On the day of the inquest hearing, and more than a year after having been warned that it could not proceed without counsel, Parallax reemerged and has moved to

1

vacate the default.  For reasons set forth below, I recommend that the Court deny the motion.

## FACTUAL BACKGROUND[1]

### A.    The Parties And Their Agreements

Parallax is a publicly listed telehealth company, whose stock is sold at penny-stock prices.  (Arena Decl. ¶¶ 3, 36.)  It is a Nevada corporation, which, at the time the case was filed, purported to be headquartered in New York City and to have an office in Santa Monica, California.  (Compl. ¶ 4.)  EMA is a private investment firm formed under Delaware law and headquartered in New York City.  (Compl. ¶¶ 5, 13.)  In 2018, Parallax sought an infusion of funds and negotiated a deal with EMA.  (Arena Decl. ¶ 4.)  As a result, Parallax and EMA entered into two sets of loan agreements that are now at issue.

On February 27, 2019, the parties executed, and EMA funded, a Securities Purchase Agreement ("First SPA") providing for EMA's purchase of a nine-month

---

[1] The factual background is drawn from several sources including:  Parallax's initial Complaint (Dkt. 1) ("Compl."); its Amended Complaint (Dkt. 19) ("Amended Compl."); the Declaration of Paul Arena, Parallax's former chief executive officer, dated March 17, 2020 filed in support of Parallax's failed motion for preliminary injunctive relief (Dkt. 14-4) ("Arena Decl."); the Declaration of Paul Arena, dated January 12, 2022, in support of Parallax's motion to vacate (Dkt. 111-1) ("Second Arena Decl."); the Declaration of Sonia Choi (Parallax's current chief executive officer) (Dkt. 111-2) ("Choi Decl."); EMA's Counterclaims (Dkt. 23 at ¶¶ 149-237); the declaration of Felicia Preston, an EMA director, dated December 24, 2020 (Dkt. 80) ("Preston Decl."); the Declaration of Jeffrey Fleischmann, EMA's counsel of record, dated December 24, 2020 (Dkt. 81) ("Fleischman Decl."), a supplemental Declaration from Mr. Fleischmann dated September 20, 2021 (Dkt. 91) ("Second Fleischman Decl."), and the Declaration of Jeffrey Fleischman, dated January 26, 2022, in opposition to the motion to vacate (Dkt. 112) ("Third Fleishman Decl."); the transcript of the inquest hearing held on December 7, 2021 (Dkt. 106) ("Hearing Tr."); and the supplemental submission filed by EMA on December 21, 2021, providing answers and support for questions raised at the hearing (Dkt. 108) ("Supplemental Submission").

convertible redeemable promissory note from Parallax in the amount of $111,000 ("First Note") along with a warrant agreement for 300,000 shares of Parallax stock at a strike price of $0.15 ("First Warrant").  (Preston Decl. ¶¶ 2-4 and Ex. A-C.[2])  The parties entered into a similar set of agreements – the Second SPA, Second Note, and Second Warrant – on April 8, 2019 for the same note amount of $111,000 and warrant for an additional 300,000 shares.  (Preston Decl.  ¶¶ 6-8 and Ex. D-F.)  Each Note carries an interest rate of 12%.  (Preston Decl. ¶¶ 43-44.)

Each Note also provides EMA with an absolute and unconditional right to convert the debt owed by Parallax into stock at a substantial discount price; Parallax is obligated to deliver the converted stock within three business days of receiving a notice of conversion from EMA.  (Preston Decl. ¶¶ 9, 15-16.)  Each Note also requires Parallax to hold a reserve of shares equal to five times the number of shares issuable upon conversion of each Note and to issue irrevocable instructions to its transfer agent setting the shares aside for that purpose.  (Preston Decl. ¶ 14.)  Parallax entered into agreements with its transfer agent to reserve shares of stock for conversion and expressly made EMA a third-party beneficiary.  (Preston Decl. ¶¶ 11-13.)

The Notes also set forth events and consequences of breach and default.  Those events include, for instance, Parallax's failure to issue shares upon EMA's exercise of its conversion rights; breach of any material covenant or term that continues for seven days after written notice from EMA; false or misleading representations or warranties; and Parallax's failing to comply with reporting requirements under the securities laws.

---

[2] Where a citation follows more than one sentence, the citation applies to all factual assertions made prior to the last citation.

(Preston Decl. ¶¶18-21.)  In the event of default, the Notes and SPAs provide EMA with the right to recover 200% – i.e., double – a "Default Sum," comprised of four components: (i) the outstanding principal, plus (ii) accrued and unpaid interest (accruing at 12%) on the unpaid principal amount to the date of payment, plus (iii) "Default Interest," plus (iv) any amounts owed pursuant to Section 1.4(g).  (Preston Decl. ¶ 22, Ex. A at Art. 3.16, Ex. D at Art. 3.18.)

The Notes define Default Interest as 24% per annum interest on any amounts of principal or interest on the Note that is not paid when due.  (Preston Decl. Ex. A at 1, Ex. D at 1.)  Section 1.4(g) of Article I imposes liquidated damages in the event that Parallax fails to deliver converted stock; the liquidated amount is $250 for each day that passes without Parallax honoring the conversion.  The four components of the Default Sum, thus are (i) outstanding principal, plus (ii) 12% accrued interest on principal, plus (iii) 24% interest on any principal or interest not paid when due, plus (iv) liquidated damages of $250 per day for failure to deliver converted shares.  (Preston Decl. Ex. A at Art. 3.16, Ex. D at Art. 3.18.)

Each Note also includes a "Cross-Default" provision by which a default under any of one of the transaction documents is considered a default under the others.  (Preston Decl. ¶ 59 and Ex. A at 3.16, Ex. D at 3.16.)  With respect to the Warrants in particular, and in the event that the shares underlying the Warrants "are not registered for resale with the Securities and Exchange Commission under an effective registration statement with a current prospectus," then the Warrants "may be exercised by means of a 'cashless exercise'" that entitles EMA to a certificate for shares equal to a specific formula.  (Preston

Decl. ¶ 60 and Ex. C at Sec. 2(d), Ex. F at Sec. 2(d).)  For the relevant time frame, Parallax stock shares were not registered for resale.  (Hearing Tr. at 14.)

The loan agreements expressly are to be "governed and construed in accordance with Nevada law [where Parallax is incorporated], without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction."  (Preston Decl. Ex. A at Art. 4.6, Ex. D at Art. 4.6.)

## B.    Parallax's Breaches And Defaults

On August 15, 2019, Parallax became delinquent on its securities filings.[3]  Parallax also failed to abide by its obligation to set aside sufficient shares in reserve for EMA and to honor EMA's notices of conversion.

Parallax initially honored notices of conversion on the First Note submitted by EMA on January 2, 2020, January 24, 2020, February 5, 2020, and February 14, 2020. (Preston Decl. ¶¶ 35-40.)  By virtue of those transactions, EMA obtained 2.2 million converted shares at a total share discount of 50%, which progressively reduced the principal owed by Parallax on the First Note from $111,000 to $69,420.[4]  (Preston Decl. Ex. ¶¶ 36, 43 and Ex. N.)

_____

[3] The Preston Declaration erroneously identified the date of delinquency as June 30, 2019.  (Preston Decl. ¶ 24.)  EMA provided corrected information in its Supplemental Submission.  In short, Parallax's June 30, 2019 SEC Form 10-Q was due on August 14, 2019 but was not filed until October 23, 2019.  (Dkt. 108 at 2 and Ex. B.)

[4] The Notes permit Parallax with the ability to pre-pay the debt on the Notes during the first six months but prohibits pre-payment after that juncture.  (Preston Decl. ¶ 17.) According to Parallax's former CEO, Parallax pre-paid $77,000 of the First Note.  (Arena Decl. ¶ 41.)  According to EMA, the $77,000 was separate consideration provided in exchange for EMA's forbearing exercising its conversion rights until December 15, 2019. (Preston Decl. ¶¶ 29-34.)  This is a factual dispute that affects damages, but not liability. For purposes of the discussion above, the Court treats the $77,000 as separate

At least as of February 28, 2020, Parallax defaulted on each Note and SPA by failing to maintain a sufficient reserve of stock for the benefit of EMA as required by Article 1.3 of each Note.  (Preston Decl. ¶ 42 and Ex. A at Art. 1.3, Ex. D at Art. 1.3).[5])

On or about March 31, 2020, EMA submitted additional notices of conversion with respect to both the First and Second Notes (the "Conversion Notices").  The First Note Conversion Notice sought to convert $83,208.26 under the First Note into 5,833,328 shares of Parallax stock at a conversion price of $.01435 (a discount of 65%), which, if honored, would have reduced the amount owed under the First Note (after doubling due to default) to $81,701.94.  The Second Note Conversion Notice sought to convert 5,653,078 shares of Parallax stock at the same conversion price of $.01435, which would have reduced the amount owed under the Second Note (after doubling due to default) to $165,171.86.[6]  (Preston Decl. ¶¶ 50-52.)  Unlike the earlier notices of conversion, Parallax did not honor the March 31, 2020 Conversion Notices.  (Preston Decl. ¶ 53.)

_____

consideration and not pre-payment.  That is more favorable to Parallax with respect to discussion (below) of a meritorious defense but less favorable with respect to damages. The issue can be resolved on supplemental inquest that will provide Parallax with an opportunity to weigh in on damages.

[5] As proof of Parallax's failure to maintain a reserve of stock for the benefit of EMA, the Preston Declaration cited to Exhibit V, which is one page of an email chain that makes no mention to the sufficiency of any reserve.  EMA provided a corrected exhibit in its Supplemental Submission.  (Dkt. 108 at 3 and Ex. C.)

[6] Preston explains derivation of the $.01435 conversion price as follows:  "On March 19, 2020, [Parallax's] stock traded at $.041, which was the lowest price in the prior twenty trading days in accordance with Section 1.2(a) [of the Note]. … Under 1.2(a) of the Note, EMA was entitled to a 30% discount off that price, which increased to 35% under the most favored nation clause in Section 4(m) of the SPA and an additional 15% discount under Section 1.2(a) of the Note because [Parallax] became delinquent in their SEC filings on June 30, 2019, and [pursuant to Section 12(a) of the Note] an additional discount of 15% because the price of the stock fell under $0.0275 on February 25, 2020 … yielding a total discount of 65%.  Thus, $0.041*.35 = $1.01435."  (Preston Decl. ¶ 51.)

## PROCEDURAL HISTORY

Parallax commenced this action on March 18, 2020.  Parallax claimed that the Notes and related agreements are unconscionable and unenforceable because they effectively require Parallax to pay approximately 75% usurious interest on each Note. (Compl. ¶ 1.)  Parallax also alleged that EMA violated the federal securities and exchange laws by failing to register as a broker-dealer and by illegally manipulating the price of Parallax stock through acquiring large quantities of converted shares at a discounted price and selling those shares into the market.  (Compl. ¶ 3.)  Parallax sought a declaration invalidating the parties' agreements, an injunction against EMA's enforcement of the agreements, return of Parallax shares and warrants, damages, and attorneys' fees. (Compl. at ECF pp. 18-19.)

The same day it commenced the action, Parallax moved by order to show cause for preliminary relief enjoining EMA from enforcing the loan documents, and for entry of partial summary judgment.  (Dkt. 4.)  Following opposition from EMA and a telephonic hearing, the Court denied Parallax's application in its entirety on March 25, 2020. (Dkt. 13.)

Parallax filed a First Amended Complaint on April 10, 2020 (Dkt. 19), which is now the operative complaint.  EMA filed an answer on May 7, 2020 denying Parallax's claims, asserting affirmative defenses, and advancing counterclaims seeking to enforce the loan documents and, among other relief, an award of damages, interest, attorneys' fees, and costs.  (Dkt. 23.)  On July 20, 2020, Parallax filed its answer to EMA's counterclaims. (Dkt. 38.)  The parties then commenced discovery.

On October 7, 2020, however, Parallax's counsel moved to withdraw as counsel. (Dkt. 62.)  Parallax did not object, nor did EMA, and the Court granted the motion to withdraw on October 23, 2020.  (Dkt. 65.)  In its order, the Court warned Parallax that, as a corporate entity, it is "not permitted to appear pro se" and that if it failed to appear by counsel within 30 days "the case will be subject to dismissal for failure to prosecute."[7] (Dkt. 65.)

Parallax did not appear by counsel.  On November 24, 2020 EMA moved for leave to file for default.  (Dkt. 67.)  Rather than grant permission at that juncture, the Court gave Parallax a final opportunity to appear by counsel and avoid default.  Specifically, the Court directed that Parallax would have "until December 1, 2020 to appear by counsel and file a response to EMA's letter requesting permission to move for Parallax's default on EMA's counterclaims and dismissal of Parallax's claims for failure to prosecute."  The Court warned that if Parallax failed to appear by counsel by December 1, 2020, then EMA could "proceed with filing the appropriate default and dismissal papers."  (Dkt. 68.)

Still no counsel appeared on behalf of Parallax.  On December 24, 2020, EMA filed for default.  (Dkt 71-75, refiled on Dec. 28, 2020, Dkt. 76-82.)  The Clerk Of Court issued a certificate of default against Parallax on December 28, 2020.  (Dkt. 78.)  The following day, the Court issued an order for Parallax to show cause at a hearing on January 28, 2021 why default judgment should not be granted against it on EMA's counterclaims and

---

[7] *See Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02, 113 S.Ct. 716, 721 (1993) ("It has been the law for the better part of two centuries, for example, that a corporation may appear in the federal courts only through licensed counsel"); *Grace v. Bank Leumi Trust Company of NY*, 443 F.3d 180, 192 (2d Cir. 2006) ("a corporation may not appear in a lawsuit against it except through an attorney, and [ ] where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55") (internal citations omitted).

dismissing Parallax's claims.  (Dkt. 85.)  Parallax did not appear for the hearing and submitted no response.  On August 10, 2021, the Court entered an order that default judgment shall be entered in favor of EMA on its counterclaims and also dismissed Parallax's claims with prejudice.  (Dkt. 87.)  The Court then referred the matter for an inquest on damages.  (Dkt. 88.)

On August 11, 2021, the Court issued a scheduling order for the inquest.  (Dkt. 89.)  By letter dated September 20, 2021, EMA indicated that it would rely on the papers previously submitted in support of its motion for default judgment along with a supplementary declaration addressing updated attorneys' fees.  (Dkt. 90.)  Although given an opportunity to respond, Parallax did not.  On November 15, 2021, the Court scheduled the inquest Hearing for December 7, 2021.  (Dkt. 95.)

The next day, November 16, 2021, the Court received a letter from an attorney, Lisbeth Merrill, stating that she was in the process of being engaged by Parallax and requesting that the Hearing be vacated or continued.  (Dkt. 96.)  EMA opposed.  (Dkt. 98.)  On November 30, 2021, the Court issued an order stating that the inquest Hearing remained scheduled as is and observing that neither Ms. Merrill nor any other attorney had not put in an appearance for Parallax.  The Court noted, however, that if counsel put in an appearance on behalf of Parallax prior to the Hearing, the Court would hear counsel for Parallax at that time.  (Dkt. 99.)

Ms. Merrill did not put in a formal appearance until the early morning hours of the day of the Hearing, December 7, 2021.  (Dkt. 100.)  Ms. Merrill participated in the Hearing by telephone.  At the Hearing, and in correspondence received that same day, Ms. Merrill asked that Parallax be granted leave to move to vacate the default judgment.  The Court

set a briefing schedule for the motion to vacate but also proceeded with the inquest Hearing to obtain from EMA more information relevant to damages.  (Dkt. 105.)   On December 21, 2021, EMA submitted its Supplemental Filing answering some of the questions that it was not able to provide at the Hearing.  (Dkt. 108.)

Parallax filed its motion to vacate on January 12, 2022.  EMA filed opposing papers on January 26, 2022, and Parallax replied on February 16, 2022, at which point the motion was fully briefed.

## THE MOTION TO VACATE

Parallax premises its motion to vacate on a distracted CEO and lack of notice.

### A.    The CEO

Paul Arena was Parallax's CEO from July 2017 up until July 8, 2021.  (Second Arena Decl. ¶ 1.)  From the time Parallax filed this action in March 2020 until his departure, Arena faced several challenges.  During March and April 2020, Arena, his wife, and his children all contracted Covid, and his father-in-law passed away.  (Second Arena Decl. ¶¶ 98-100.)

In April 2020, the SEC delisted Parallax's stock from trading and began to investigate representations made by Parallax in a press release.  (Second Arena Decl. ¶ 102.)  According to Arena, he and Parallax faced numerous lawsuits.  (Second Arena Decl. ¶ 103.)  Between mid-November 2020 and early summer of 2021, Arena was "consumed" by the SEC investigation.  (Second Arena Decl. ¶ 105.)

On July 7, 2021, Arena stepped down as CEO of Parallax.  (Choi Decl. ¶ 5.)  Two days later, the SEC, Parallax, and Arena entered into a consent judgment, which had been negotiated and reviewed over a period of several months.  (Second Arena Decl. ¶

108.)  On September 14, 2021 (about a month after default had been entered in the instant case), Parallax appointed a new CEO, Sonia Choi.  At that time, Choi had no knowledge of this lawsuit and "it was apparent that the former CEO, focused on the SEC allegations, was extremely distracted by the events occurring through the date of his termination."  (Choi Decl. ¶¶ 1-2, 6.)

## B.   Notice

The timeline of relevant events of notice is as follows.  On October 8, 2020, Parallax's attorney served his client with a motion to withdraw as counsel by emailing the motion to Parallax's then CEO, Arena, and its chief financial officer.  The affidavit of service stated that counsel had received confirmation from Arena of his receipt of the email.  (Dkts. 62-64.)  On October 23, 2020, the Court issued its order granting withdrawal, staying the case for 30 days, and warning Parallax that if it did not appear by counsel within 30 days, its case would be dismissed for failure to prosecute.  (Dkt. 65.) Parallax's attorney served the Court's order on Parallax at the same two email addresses as before.  (Dkt. 66.)

Arena concedes that he received the October 23, 2020 order and "understood" that Parallax's claims would be dismissed for failure to prosecute if he could not find substitute counsel.  He states, without explaining why, that he "was unable to immediately engage new counsel."  He denies understanding that default on EMA's counterclaims would be entered without further notice, but "vaguely recall[s] seeing a letter from EMA's attorney requesting permission to move for default on the counterclaims and dismissal of the claims."  (Second Arena Decl. ¶¶ 104, 106.)  Arena says that "by then," however, he

"was quite distracted and put it out of my mind expecting I would see an official motion which I never received."  (Second Arena Decl. ¶ 106.)

On November 24, 2020, EMA served Parallax with the Court's order extending to December 1, 2020, Parallax's time to appear by counsel and file a response" to EMA's request to move for default.  (Dkt. 68.)  As directed in the court's order, EMA effected service by email to Arena at his Parallax email address and by first class mail to Parallax's Santa Monica address.  (Dkt. 69.)  Arena was still Parallax's CEO at the time and does not deny that he received the Court's order.

On December 30, 2020, EMA served on Parallax EMA's formal default motion along with the Court's order to show cause requiring Parallax to appear for a hearing on January 28, 2021.  The order to show cause directed that EMA serve Parallax by overnight mail at its last known business address.  (Dkt. 85.)  EMA complied, serving the order by FedEx overnight service at both the New York and Santa Monica addresses for Parallax.  (Dkt. 86.)

According to Arena, Parallax's New York office closed down in May 2020, and its Santa Monica office was vacated in December 2020.  (Second Arena Decl. ¶ 107.)  The Santa Monica address is the address the parties agreed to in their agreements as the mailing address where EMA was to serve Parallax with notice and service of legal process.  (First and Second SPA § 10(i) at Preston Decl. Ex B at 10(i), Ex. F at10(i).)  At no time did Parallax ever advise EMA, or this Court, of a change of address.  (Third Fleischman Decl. ¶ 10.)  As of at least July 2021, the filings with the Nevada Secretary of State identify the Santa Monica address as that of Parallax's offices.  (Choi Decl. Ex. 5; Third Fleischman Decl. Ex. I.)  And even as of January 22, 2022, Parallax's own website

continued to identify its business and mailing address as the Santa Monica location. (Third Fleischman Decl. Ex. J.)

On September 23, 2021, EMA served the order of default (entered in August 2021) by FedEx on Parallax at its Santa Monica address.  (Dkt. 93.)  FedEx confirmed receipt and delivery of the papers.  (Third Fleischman Decl. Ex. H.)  EMA also served the Secretary of State of New York as directed by this Court's inquest order.  (Dkt. 89, 94.)

The new CEO, Choi, first learned of the case (she does not provide a date) when she received an email that had been sent to former counsel regarding the inquest hearing.  (Choi Decl. ¶ 6.)

## LEGAL STANDARDS

In support of its motion to vacate, Parallax invokes Federal Rules of Civil Procedure 55 and 60(b).  Prior to entry of final judgment, the Court may set aside a default for good cause.  Fed. R. Civ. P. 55(c).  "Although the rule does not define 'good cause,'" the Second Circuit has "advised district courts to consider three factors in deciding a Rule 55(c) motion: (1) whether the default was willful; (2) whether the moving party has presented a meritorious defense; and (3) whether setting aside the default would prejudice the party for whom default was awarded."  *State Farm Mutual Automobile Insurance Co. v. Cohan*, 409 F. App'x. 453, 455 (2d Cir. 2011) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir.1993)).  "Other relevant equitable factors may also be considered, for instance, whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result."  *Enron*, 10 F.3d at 96.

13

Once final judgment is entered, the Court may relieve a party from it based on "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 55(c), 60(b)(1). The court's determination under Rule 60(b)(1) is guided by the same three principal factors: willfulness, the existence of a meritorious defense, and prejudice to the non-defaulting party. Even so, the standard under Rule 55 is more "forgiving" than under Rule 60(b). *State Farm*, 409 F. App'x at 455 (citing *New York v. Green*, 420 F.3d 99, 109 (2d Cir. 2005)).

Default judgments generally are disfavored. *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 168 (2d Cir. 2004). Accordingly, the Rules governing vacatur of default, and the factors considered in applying them, are to be construed "generously." *Enron*, 10 F.3d at 96. When considering a motion to set aside a default judgment, "doubts must be resolved in favor of the party seeking relief from the judgment in order to ensure that to the extent possible, disputes are resolved on their merits." *Green*, 420 F.3d at 104 (citing *Powerserve International, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001)). At the same time, "courts have an interest in expediting litigation [and] abuses of process may be prevented by enforcing those defaults that arise from egregious or deliberate conduct." *American Alliance Insurance Co. v. Eagle Insurance Co.*, 92 F.3d 57, 61 (2d Cir. 1996). Whether to grant or deny a motion to vacate ultimately is "addressed to the sound discretion of the district court." *State Street*, 374 F.3d at 166.

## DISCUSSION

Consideration of the relevant factors and the specific facts of this case warrant denying Parallax's motion.[8]  Parallax's CEO consciously decided to put his priorities on other matters rather than appearing by counsel and prosecuting Parallax's case or defending against EMA's counterclaims.  That may not be surprising, because Parallax's defenses to EMA's counterclaims have no merit.  And while prejudice to EMA from vacatur is slight – having expended money and time on proceeding through default, inquest briefing, and an inquest hearing – the combination of factors weighs decidedly against vacating the default.  Rather, the appropriate remedy is to permit Parallax to respond to EMA's damages analysis.

### A.     The Applicable Rule

Before embarking on an analysis of the factors, the Court addresses the question of whether the applicable Rule is 60(b)(1) or instead the more "forgiving" standard of Rule 55(c).  The Court will proceed under the latter.  The instrument by which the Court granted EMA's motion for default judgment is captioned as a "Default Judgment."  (Dkt. 87.)  And a certificate of default already had been entered by the Clerk of Court.  (Dkt. 78.)  The Court's "Default Judgment," however, says that default judgment "shall be entered" as if that were a step to follow later, such as after inquest on damages.  That makes sense as

---

[8] EMA contends that the Court need not even address vacatur on the merits because Parallax's motion is "wildly untimely," having been filed twelve months after entry of the certificate of default and five months after the Court's entry of a judgment of default.  (EMA Mem. at 9.)  ("EMA Mem." refers to EMA's Memorandum Of Law In Opposition To Plaintiff And Counterclaim Defendant Parallax Health Sciences, Inc.'s Motion To Vacate The Order Of Dismissal And Default at Dkt. 113.)  The Court does not agree.  EMA's argument essentially renders meaningless the "good cause" inquiry under Rule 55(c).  The cases EMA relies on address Rule 60(b)(1), which as explained below, is not the applicable rule.

the Second Circuit has clearly indicated that a default is not a final judgment while an inquest is pending.  *See Enron*, 10 F.3d at 97 (entry of default "judgment" was invalid and must be treated as entry of "default" where district court had referred the matter for calculation of damages).  This Court thus will proceed on the basis that the Rule 55(c) "good cause" supplies the requisite standard.[9]

**B.    Willfulness**

The most significant factor in the vacatur analysis is willfulness, which may alone be sufficient to deny a motion to vacate.  *Jaramillo v. Vega*, 675 F. App'x 76, 76 (2d Cir. 2017); *De Curtis v. Ferrandina*, 529 F. App'x 85, 86 (2d Cir. 2013).  "A default is willful when the conduct is more than merely negligent or careless, but is instead egregious and not satisfactorily explained."  *Jaramillo*, 675 F. App'x at 76 (internal quotation marks removed) (quoting *Bricklayers and Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Construction, LLC*, 779 F.3d 182, 186 (2d Cir, 2015) (in turn quoting *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998)).  "Although more than negligence is required, 'the degree of negligence in precipitating the default is a relevant factor to be considered.'"  *Id.* at 76-77 (quoting *Green*, 420 F.3d at 108) (in turn quoting *American Alliance*, 92 F.3d at 59)).

Parallax's default was unquestionably willful.  Its CEO, Arena, received notice and knew that the company's attorney had moved to withdraw and that the Court had granted the motion.  Arena concededly received and understood the Court's October 23, 2020 order granting withdrawal and warning Parallax that if it did not appear by counsel within

---

[9] Of course, because the Court finds that vacatur is not warranted under Rule 55(c), it necessarily also is not warranted under the less forgiving Rule 60(b).

30 days, its case would be dismissed for failure to prosecute.  (Dkt. 65.)  Parallax did not appear by counsel, ask for an extension, or respond to the Court or EMA during that 30-day period.

Similarly, Parallax received notice of the Court's November 24, 2020 order extending to December 1, 2020, Parallax's time to appear by counsel and file a response to EMA's request to move for default.  (Dkt. 68.)  As noted above, Arena was still Parallax's CEO at the time and does not deny that he received the Court's order.  Even so, Parallax again did not appear by counsel, ask for an extension, or respond to the Court or EMA during that period of time.

Parallax also did nothing after EMA properly served it on December 30, 2020, with the Court's order to show cause requiring Parallax to appear for a hearing on January 28, 2021.  Nor did Parallax do anything when properly served with the Court's "Default Judgment" in September 2021.

Neither of the two excuses offered by Parallax – neglect and lack of notice – survives scrutiny.  That Parallax's CEO was busy with other things and "distracted" is far from a satisfactory explanation.  To the contrary, Arena provides no explanation at all for why, in October or November 2020 he – or anyone else at the company for that matter – "was unable to immediately engage new counsel."  He also never asserts that he was not later able to engage new counsel.  He simply chose not to, putting his focus on other things.

That Arena and his family were struck with Covid shortly after Parallax filed the lawsuit in March 2020 is unfortunate but irrelevant to his failure to respond to notice he received months later in the fall of 2020.  And although he was "quite distracted" by the

SEC investigation and other litigation in the ensuing months, that is no excuse for failing to act and retain counsel to appear in the case – a case that, after all, Parallax elected to file. Arena remained CEO of Parallax until July 8, 2021. Yet neither he nor any of Parallax's listed officers or anyone else put a priority on retaining counsel for the instant case.

The Court recognizes that Parallax's new CEO, installed in September 2021, proceeded to retain counsel and seek vacatur of the default. But that was a full year after Parallax had been warned to retain counsel and failed to do so. Parallax's excuse essentially is that it should get a do-over because the CEO who presided when the case was filed decided to ignore it after parting ways with the company's lawyer representing it at the time. That Parallax's current CEO may be more responsible does not excuse the sins of the company during the reign of her predecessor.

Parallax's notice argument does not fair any better. At all times, notice was served on Parallax as provided in the parties' agreements and in compliance with the methods directed by the Court. Parallax does not dispute receiving the two Court orders directing it to retain counsel and the consequences of not doing so.[10] As for the notices after that,

---

[10] Arena suggests that while he received and understood that Parallax's case would be dismissed, he did not understand that the company would be in default with respect to EMA's counterclaims. To be sure, the October 23, 2020 order expressly stated that the case would be dismissed but did not expressly mention default. (Dkt. 65.) The November 24, 2020 order, however, referred to both dismissal and EMA's request to file for default. (Dkt. 68.) And, regardless, Arena knew as a result of the October 23, 2020 order that the only way the company could act was by appearing through counsel. *See Zimmerling v. Affinity Financial Corp.*, 478 F. App'x 505, 508 (10th Cir. 2012) (rejecting corporate defendant's argument that default was not deliberate where motion for default was never personally served, because of the deliberateness of the defendant's "predicate act" of not hiring counsel despite being warned that it was necessary to do so).

18

beginning with the order to show cause served on December 30, 2020, Parallax's excuse appears to be based on Arena's contention that the company's Santa Monica office was "vacated" in December 2020.  That is quite dubious inasmuch as FedEx successfully delivered the documents there, and even as of January 2022, months after Parallax's new CEO came aboard, Parallax's website continued to identify the Santa Monica location as its place of business.  Moreover, Arena's declaration provides no supporting proof, and Parallax's new CEO does not identify any other office location for Parallax.  But even accepting Arena's assertion as true, it does not excuse Parallax's failure to update either EMA or the Court as to its change of address – the very address that the parties' agreements designate for service.

Parallax has not cited any case where a company's change in management warranted vacatur of default that was entered due to prior management's willful neglect. The Court has, however, found one case that bears some similarity to the situation presented here, although it is materially distinguishable.  *See Argus Research Group, Inc. v. Argus Securities, Inc.*, 204 F. Supp.2d 529 (E.D.N.Y. 2002).

In *Argus*, the plaintiff filed the action and served the defendant company with summons and complaint on March 1, 2000.  The defendant did not answer.  At plaintiff's request, the Clerk of Court entered default against the defendant on July 26, 2000.  In September 2000, an individual named Kay brought control of the defendant company from his predecessor-in-interest, Cook.  Cook warranted that there were no outstanding legal claims against the company at the time of sale.  Kay first learned of the action on November 9, 2000 when the plaintiff served its motion for default judgment.  Kay retained counsel on February 23, 2001, who appeared days later.  The court granted the motion

19

to vacate, finding that the defendant had not acted willfully and that the new owner acted diligently after becoming aware of the lawsuit.

The instant case does not merit a similar finding. First, nothing in *Argus* indicates what Cook, the original, owner knew or did not know or did or did not do with respect to the action that had been filed against the company. Here, in contrast, it is indisputable that Parallax's CEO initiated the lawsuit, knew of the obligation to retain counsel, and consciously disregarded it. Second, in *Argus*, the previous owner made an affirmative misrepresentation as to there being no legal action against the company. Here, there is no similar deception. Third, unlike in *Argus*, Parallax did not update or apprise either EMA or the Court of any change of address, even after the new CEO entered the picture and even though Parallax had contractually agreed to accept service there. Finally, as will be discussed next, Parallax has no meritorious defense whereas the defendant in *Argus* did.

In sum, Parallax filed a lawsuit and then abandoned it after parting ways with its counsel at the time. Parallax's CEO understood the company's obligation to retain new counsel but did nothing about it, focusing instead on other matters. That is willful conduct.

## C.    No Meritorious Defense

"In order to make a sufficient showing of a meritorious defense in connection with a motion to vacate a default judgment, the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense." *Cortez v. Lin*, No. 19-CV-0905, 2019 WL 4256363, at *4 (S.D.N.Y. Sept. 9, 2019) (Schofield, J.) (quotation marks and citation omitted); *accord Argus*, 204 F. Supp.2d at 533 (quoting *Enron*, 10 F.3d at 98). The defense and facts presented must

be "good at law so as to give the factfinder some determination to make." *American Alliance*, 92 F.3d at 61 (quotation marks and citation omitted).   None of Parallax's defenses meet those standards.

In moving for vacatur, Parallax initially proffered three defenses.  (Parallax Mem. at ECF 9.[11])  First, it asserted that EMA defrauded Parallax, inducing EMA to enter into the Notes and related agreements that enabled EMA to manipulate the price of EMA's stock in violation of Sections 10(b), 10(b)(5) and 15(a)(1) of the Exchange Act.  Second, Parallax contended that the contractual agreements were "unconscionable."   Third, Parallax argued that the agreements should be voided as illegal because EMA failed to register as a broker dealer under the Exchange Act, 15 U.S.C. § 78cc.  None of those defenses are meritorious.[12]

---

[11] "Parallax Mem." refers to Plaintiff's Memorandum Of Law In Support Of Its Motion To Vacate Order Of Dismissal And Default at Dkt. 111.

[12] In reply, Parallax defended only one of its defenses against EMA's opposing arguments: the unregistered broker-dealer defense.   (*See* Parallax Reply at 4-6.) ("Parallax Reply" refers to Plaintiff's Memorandum Of Law In Support Of Its Reply To Opposition To Motion To Vacate Order Of Dismissal And Default at Dkt. 114.)   Parallax could thereby be deemed to have abandoned the other two purported meritorious defenses.  Parallax's reply does mention that "Parallax submitted evidence in support of its other defenses as set forth in its motion."  (Parallax Reply at 6.)  It does not, however, offer any response to the arguments raised by EMA.  *See Personal Watercraft Product SARL v. Robinson*, No. 16-CV-9771, 2017 WL 4329790, at *4 (S.D.N.Y. Sept. 1, 2017) ("The Defendant does not reply to any of these arguments in his reply brief, nor return to the argument that the Court should disregard certain allegations in that brief. … The argument is thus abandoned); *In re Hoti Enterprises, L.P.*, Nos. 10-CV-24129, 13-CV-3638, 2014 WL 1244779, at *4 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 605 F. App'x. 67 (2d Cir. 2015) (summary order) ("Dedvukaj does not address GECMC's response in his reply and is therefore deemed to have abandoned this argument.").  Nonetheless, the Court bases its decision on analysis of the merits as discussed above.

### 1. Fraud

Other than setting forth the distractions Arena faced during 2020 and 2021, his supporting declaration merely rehashes the allegations set forth in Parallax's complaint and preliminary injunction papers that sought to declare the Notes and agreements unenforceable.  According to Arena, he was induced to "move forward with funding" from EMA because his primary contact at EMA told him that EMA wanted to create a relationship with Parallax and would not take any action that would harm Parallax. (Second Arena Decl. ¶¶ 10-11, 15-17.)  The contractual agreements, however, expressly provide EMA with the right to convert at a discount and to then sell the acquired stock into the public market – precisely what Parallax claims was harmful to the company.  (*See* First and Second SPA § 2(a) at Preston Decl. Ex B at 2(a), Ex. F at 2(a))("Purchaser does not agree, or make any representation or warranty, to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time ….").  The fraudulent statements alleged by Parallax are directly at odds with the express terms of the parties' contracts, and thus cannot be the basis for a fraud claim under Nevada law.  *Magpiong v. Superdry Retail LLC*, 304 F.Supp.3d 983, 987 (D. Nev. 2018); *Road & Highway Builders v. North Nevada Rebar*, 128 Nev. 384, 284 P.3d 377 (2012).[13]

---

[13] Nor would the alleged statements be actionable as fraudulent inducement under New York law as they are merely statements of intention and not present fact.  *See, e.g., Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement").

Parallax asserts that the Notes and agreements are unenforceable because they enabled EMA to obtain large quantities of Parallax stock at a discount and thereby manipulate the price of EMA's stock.  This scenario has played out a number of times with companies willing to accept funding in exchange for considerable interest, conversion and other rights, and steep consequences for default.  After the lender's exercise of multiple conversions at discounted rates, the funded company finds itself in an untenable predicament and defaults on the most recent conversion demands, leaving the lender with substantial claims.

That pattern is sometimes referred to as "death spiral" or "toxic" financing in which a lender provides an early-stage company with capital in exchange for debt that can be converted to stock in the company.  The economics can cause the price of the company issuing the stock to plunge to nearly zero when the lender exercises multiple rounds of conversion and sale of the stock on the open market at successively lower prices.  *See Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18-CV--7632, 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019) (describing death spiral financing).

But there is nothing inherently illegal about the arrangement or practice.  Despite the attempts of borrowers like Parallax to fend off the lenders' claims and evade the consequences of their contractual default, courts regularly hold the borrower liable for breach of, and default under, the relevant agreements.  *See, e.g.*, *Alpha Capital Anstalt v. ShiftPixy, Inc.*, 432 F. Supp. 326, 331, 336-37 (S.D.N.Y. 2020); *EMA Financial, LLC v. AIM Exploration, Inc.*, No. 18-CV-145, 2019 WL 689237, at *11 (S.D.N.Y. Feb. 19, 2019); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp.3d 339, 348 (S.D.N.Y. 2018).

### 2. Unconscionability

In its preliminary injunction papers, Parallax focused a good deal on what it purports to be the unconscionable and usurious nature of the Notes and agreements at issue. The Court was skeptical of those arguments then, and they fair no better now. The agreements are neither usurious nor unconscionable.

Parallax makes no effort in its briefing to set forth the requirements for a contract to be found unconscionable, let alone analyze the facts under those requirements. The Court will briefly undertake that exercise. Nevada law requires that "[t]o be unenforceable, the contract term generally must be both procedurally and substantively unconscionable. … A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract. … Procedural unconscionability usually results from the use of fine print or complicated, incomplete, or misleading language that fails to inform a reasonable person of the contractual language's consequences. … A contract is substantively unconscionable when the contract's terms and the surrounding circumstances at the time of execution are so one-sided as to oppress or unfairly surprise an innocent party." *Guerra v. Hertz Corp.*, 504 F. Supp. 1014, 1021 (D. Nev. 2007) (quotation marks and citations omitted).

Parallax has offered no facts to establish procedural unconscionability. Parallax and EMA both are sophisticated parties. Indeed, CEO Arena was no naif. As he recognizes, he was brought on as CEO in July 2017 to manage overall operations, including accounting, financing, and SEC reporting. (Second Arena Decl. ¶ 2.) Arena

negotiated with EMA before entering into a deal with them.  (Second Arena Decl. ¶¶ 3-22.)  He had previous experience with funding agreements for similar arrangements.  (Second Arena Decl. ¶¶ 8, 18.)  His sworn declarations are filled with sophisticated calculations, business concepts, and legal arguments.

Even if, as Arena posits, EMA had "superior bargaining positions" (Second Arena Decl. ¶ 20), the agreements at issue are the antithesis of adhesion contracts; Arena could have walked away if he did not like the terms of the deal and sought funding elsewhere.  Similarly, Arena's assertion that "[u]nbeknownst to me, the [First Note and SPA] were fraught with hidden liquidated damages and penalty provisions" rings hollow given that Arena reviewed the draft documents and made "limited comments for revision."  (Second Arena Decl. ¶¶ 22, 26.)

Nor can Parallax establish substantive unconscionability.  Before it defaulted in the litigation, Parallax argued in its complaint and motion for preliminary injunctive relief that the agreements with EMA were unenforceable because, taking into account the combination of regular interest, conversion rights, liquidated damages, and warrant rights, EMA effectively charged Parallax a usurious 75% interest on the loans in violation of New York law.  (Dkt. 14-1 at 8-15.)  That argument, however, is a non-starter.

First, the Notes expressly require application of Nevada law.  (Preston Decl. Ex. A at Art. 4.6, Ex. D at Art. 4.6.  Under Nevada law, usury is not a defense to enforcement. *EMA Financial, LLC v. NFusz*, 444 F. Supp.3d 530, 539 (S.D.N.Y. 2020) (citing *Consumers Distribution Co. v. Hermann*, 107 Nev. 387, 812 P.2d 1274, 1278 (1991) and NRS 99.050).  Recognizing that obstacle, Parallax argued that the choice of law provision

should be disregarded based on public policy grounds.[14]   (Dkt. 14-1 at 9-11.)   But in denying Parallax's motion for preliminary relief, the Court expressed "serious doubt" about that argument.   (Dkt. 20 at 23.)   That is not surprising.   Another court from this District facing the same issue in a case where EMA sought to enforce similar loan agreements, concluded that the parties' choice of Nevada law "must be enforced."   *NFusz*, 444 F. Supp.3d at 540, 543.   The Court finds no reason to conclude otherwise here.

Second, even if New York law did apply, Parallax's argument is misguided. Parallax argued that the interest rates actually imposed by the Notes is approximately 75% (74.26% on the First Note and 75.99% on the Second Note), comprised of three components:   the regular interest rate of 12% on the Notes, the value of the Warrants, and the original issue discount off the principal loaned.   (Dkt. 14-1 at 8.)   That argument is unavailing.   The Warrants, which were "out of the money",[15] are not properly categorized as interest due to the uncertainty of if and when they would be exercised. *See NFusz*, 444 F. Supp.3d at 544-45 (citing "slew" of cases and holding that conversion discounts and warrant shares that are out-of-the-money are not relevant to the usury analysis); *AIM Exploration*, 2019 WL 689237 at *8 ("the case law in this District is uniform in holding that the value of conversion discounts should not factor into the usury analysis").

---

[14] In moving to vacate, Parallax embraces application of Nevada law to support one of its alleged defenses.   (Parallax Reply at 4 ("in the agreement between the parties, Nevada law applies, not New York law").   As discussed below, Parallax is mistaken that state law applies to the defense, which is asserted under federal securities laws, but its new-found fondness for Nevada law betrays the weakness of the positions it has taken in this case.

[15] Supplemental Submission at 4 and Ex. E (First Warrant); Preston Decl. at ¶ 7 (Second Warrant).

Without including the Warrants as interest, the two remaining components in Parallax's interest calculation are the 12% regular interest, and the original issue discount. For the First Note, the original issue discount value was $6,660; for the Second Note, it was $8,650.  (Arena Decl. ¶¶ 25, 28.)  In neither instance is the resulting interest rate higher than New York's usury cap of 25%.[16]  Similarly, the default interest rate of 24% that EMA seeks to enforce is below New York's usurious limit and is enforceable.  *See AIM Exploration,* 2019 WL 689237 at *12 (enforcing 24% default interest rate in accordance with terms of notes on which defendants defaulted).  Moreover, "the majority of district courts in this Circuit to have considered the issue have held that New York's usury laws do not apply to default interest rates."  *Blue Citi, LLC v. Barz International Inc.,* 338 F. Supp. 3d 326, 336 (S.D.N.Y. 2018), *aff'd,* 802 F. App'x 28 (2d Cir. 2020); *see also AIM Exploration*, 2019 WL 689237 at *10 (citing cases and similarly holding that borrower could not maintain a usury defense based on note's default interest rate).

Parallax also argued that even if not void from the outset, the agreements could not be enforced because the Default Sum calculation included liquidated damages that amount to nothing more than a penalty.  (Dkt. 14-1 at 15-16.)  Parallax specifically called out the fourth component of the Default Sum calculation, which imposes $250 in liquidated damages for each day that Parallax fails to honor EMA's conversion notices.

---

[16] New York has two usury statutes, one civil and one criminal.  Under the civil usury statute, N.Y. Gen. Obl. Law § 5-501, a rate of interest exceeding 16% per annum is usurious.  Corporations, however, may not assert civil usury as a defense in litigation. *AIM Exploration,* 2019 WL 689237, at *6 (citing N.Y. Gen. Obl. Law § 5-521(1)).  In contrast, a corporation may assert as an affirmative defense criminal usury, which prohibits interest rates knowingly charged at a rate of 25% or more per annum.  *Id.* (citing N.Y. Penal Law § 190.40, and N.Y. Gen. Obl. Law § 5-521(3)).

Once again, however, Parallax premised its argument on New York law,[17] which does not apply.  And, in any event, the issue is moot as EMA does not seek to enforce the liquidated damages' component of the Default Sum and instead seeks actual damages for Parallax's failure to honor EMA's conversion rights.[18]  (Hearing Tr. 28.)

Although not couched in terms of liquidated damages, another component of the Default Sum arguably may be characterized as such: doubling of the Default Sum.[19] Courts appear to be split on whether such a provision is enforceable.  *Compare LG Capital Funding, LLC v. One World Holding, Inc.*, No. 15-CV-698, 2018 WL 3135848, at *14 (E.D.N.Y. June 27, 2018), adopting in relevant part, 2015 WL 13748548 (E.D.N.Y. Aug. 6, 2015) (upholding 200% multiplier) with *EMA Financial, LLC v. Joey New York, Inc.*, No. 17-CV-9706, 2022 WL 292920, at *15 (S.D.N.Y. Feb. 1, 2022) (determining that multiplier of 150% was equivalent to liquidated damages and therefore unenforceable, and calculating actual damages instead).  As demonstrated in *EMA v. Joey New York*, however, the unenforceability of a liquidated damages provision goes to determination of damages, not liability.  2022 WL 292920 at *15.

---

[17] *See, e.g., Truck Rent-A-Ctr, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 369 (1977) ("It is plain that a provision which requires, in the event of contractual breach, the payment of a sum of money grossly disproportionate to the amount of actual damages provides for penalty and is unenforceable").

[18] Courts have invalidated similar liquidated damages provisions imposing a daily payment where the lender did not offer any explanation for how the daily payment was "even conceivably linked" to damages from the borrower's failure to honor conversion rights.  *Union Capital v. Vape Holdings, Inc.*, No. 16-CV-1343, 2017 WL 1406278, at *7 (S.D.N.Y. March 31, 2017); *see also Adar Bays*, 341 F. Supp. at 349; *LG Capital Funding, LLC v. 5Barz International, Inc.*, 307 F. Supp.3d 84, 101 (E.D.N.Y. 2018).

[19] Parallax's papers in support of preliminary injunctive relief do not appear to specifically challenge the two-times component of the Default Sum.

### 3. Broker-Dealer Law

Parallax's third defense, and the only one it defends in its reply, is that the agreements are subject to being voided or rescinded under the Exchange Act because EMA is not a registered dealer-broker. That argument is foreclosed as a matter of law.

Under federal Exchange Act law, a broker or dealer must be registered with the SEC. 15 U.S.C. § 78o(a)(1). A broker is defined generally as "any person engaged in the business of effecting transactions in securities for the account of others," while a dealer is defined generally as "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(4)(A), (5)(A). As Parallax would have it, EMA is an unregistered broker-dealer because, without being registered, it engaged in the regular business of buying convertible notes and selling the newly acquired shares into the public market. Therefore, as Parallax argues, the agreements with EMA are void under the Exchange Act, which provides that "[e]very contract made in violation of any provision of [the Act] … and every contract … the performance of which involves the violation of … any provision [the Act] … shall be void …." 15 U.S.C. § 78cc(b).

Assuming for argument's sake that EMA qualified as an unregistered broker or dealer, its status as such would have no bearing on validity of the agreements at issue. That is because nothing in the agreements require EMA to perform an act that would qualify it as a broker or dealer. The crux of Parallax's broker-dealer defense is that it sold into the market, at a low price, large quantities of stock it acquired at discount through conversion. (*See* Second Arena Decl. ¶¶ 69-90.) But nothing in the agreements at issue

require EMA to perform by selling the stock it obtains from conversion or to otherwise act as a broker or dealer.

Faced with similar convertible note agreements and disputes in this District, courts consistently and firmly have rejected the broker-dealer argument made here by Parallax. *See EMA v. Joey New York*, 2022 WL 292920 at *18 ("This argument is unconvincing in light of recent and very clear case law from this District on this precise issue, which holds that absent language in the agreements requiring [EMA] to register as a broker-dealer, this affirmative defense cannot succeed); *EMA v. NFusz*, 509 F. Supp. at 37 n.22 ("In this District," it is "essential" to identify a provision in the agreement requiring plaintiff to register as a broker-dealer); *EMA Financial v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) ("The flaw in Vystar's argument … is that it does not identify a provision in the contracts that obligates Ema to act as a broker-dealer); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, No. 17-CV-4006, 2018 WL 6547160, at *15 (S.D.N.Y. Sept. 28, 2018) ("even if LG should have registered [as a dealer], nothing in the Note or the SPA indicates that those contracts 'could not have been legal performed' because LG failed to do so").[20]

As explained in *EMA v. Vystar*, a contract is not subject to voiding or rescission "when the violation complained of is collateral or tangential to the contract between the parties …; rather, a contract can be voided where there could be no performance under the contract without violating the Act. … In other words, under … the Exchange Act, only

---

[20] Parallax attempts to deflect these cases with the argument that under the parties' agreements Nevada law applies, not that of New York.  (Parallax Reply at 4-5.)  The broker-dealer defense, however, is predicated on alleged violation of federal securities law, not state contract law.

unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." 336 F.R.D. at 81 (internal quotation marks and citations omitted). Here, as in the cases cited above addressing the same or similar agreements and conduct, the conduct of which Parallax complains is collateral to the parties' agreements, and the contracts are not unlawful.

Parallax suggests that the cases rejecting the broker-dealer argument do not reflect the view of the First, Fifth, and Ninth Circuits. Specifically, Parallax asserts, those Circuits "have all analyzed §29(b) rescission claims under the unlawful formation of the underlying contract rather than in its performance finding that a contract is voided on th[e] grounds that it was unlawful 'as made.'" (Parallax Reply at 5 (citing *Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, 6 F.4th 50 (1st Cir. 2020); *Daley v. Capitol Bank & Trust Co.,* 506 F.2d 1375 (1st Cir. 1974); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968).) Those cases, however, are not inconsistent with those of the courts in the Second Circuit. For instance, in *Edgepoint*, the court found voidable a contract where the "sale of securities were inseparable from the contract's central purpose of selling Apothecare and the Sell-Side Agreement was illegal as in fact performed." 6 F.4[th] at 61. Echoing the same words set forth in *EMA v. Vystar*, the court, quoting statements from an earlier First Circuit case, explained that "the violation must be inseparable from the performance of the contract rather than collateral or tangential to the contract." *Id.* (internal quotation marks omitted.) As already noted, the situation here fits the latter scenario. EMA's sale of the stock it obtained by conversion was merely collateral to the contract, and far from inseparable from it.

Thus, Parallax's broker-dealer defense, like its fraud and unconscionability defenses, are not meritorious.  Parallax has come forward with no facts that "would constitute a complete defense."  *Cortez*, 2019 WL 4256363 at * 4; *see also State Farm*, 409 F. App'x at 456 ("In order to make a sufficient showing of a meritorious defense in connection with a motion to set aside a default, the defendant … must present credible evidence of facts that would constitute a complete defense.  We agree with the district court that the defendants failed to meet this hurdle with respect to either of the defenses they raised in their Rule 55(c) motion.") (internal citation omitted).

## D.  Prejudice

The third factor to consider is "whether and to what extent, vacating the default judgment will prejudice the non-defaulting party."  *Green*, 420 F.3d at 110.  "Delay standing alone does not establish prejudice."  *Enron*, 10 F.3d at 98.  Instead, vacating a default may result in unfair prejudice if, for example, it thwarts the plaintiff's recovery, results in the loss of evidence, increases the difficulties of discovery or provides greater opportunity for fraud and collusion."  *Cortez*, 2019 WL 4256363 at *6; *accord Green*, 420 F.3d at 110 (quotation marks and citation omitted).

The only prejudice asserted by EMA is that it has already spent time and money on moving for default, submitting inquest papers, attending the inquest hearing, and providing additional information after the hearing.  Some courts have recognized expenditure of such resources as prejudicial; others have not.  *Compare, e.g., Directv, Inc. v. Rosenberg*, No. 02-CV-2241, 2004 WL 345523, at *4 (S.D.N.Y. Feb. 24, 2004) ("Defendant's obstinate conduct has caused Plaintiff to incur substantial attorney's fees and costs.  Allowing Defendant to reopen litigation in this case would only unnecessarily

add to Plaintiff's expenses.  Thus, the Court finds that Plaintiff will be prejudiced if the default in this case were vacated.") with *Hernandez v. La Cazuela de Mari Restaurant, Inc.*, 538 F.Supp.2d 528, 534 (E.D.N.Y. 2017) ("The incurrence of these costs [of moving for default] does not establish prejudice").  In this instance, the Court does not find the time and money expended to be particularly prejudicial; most of what EMA compiled, filed, and presented would have been incurred to some extent during the litigation.  And, as Parallax points out, the parties' agreements have an attorneys' fees provision that benefits EMA.

Parallax contends that in contrast to the little prejudice incurred by EMA, the prejudice to Parallax in not vacating the default is substantial in that it faces the potential for a judgment in excess of $1.5 million.  (Parallax Mem. at ECF 7.)  The Court agrees that the amount at issue is an equitable factor it may take into account.  *See Enron*, 10 F.3d at 96 (court may consider extent to which entering default would be "harsh or unfair").  Regardless, denial of Parallax's motion by no means precludes it from challenging the amount of damages to be awarded.  Parallax appeared by counsel at the damages inquest, and the Court has not yet issued its report and recommendation on the amount of damages.  Parallax will be given an opportunity to be heard and make a submission on that issue.

## E.   Weighing The Factors

Considering all the relevant factors, vacatur should be denied.  Parallax, through its CEO, acted willfully in failing to retain and appear by counsel.  It has no meritorious defense.  Even though EMA would suffer little prejudice from vacatur, the absence of a meritorious defense, combined with Parallax's willful neglect of the case, is more than

sufficient reason to deny Parallax's motion.  *See S.E.C. v. McNulty*, 137 F.3d at 738 ("An absence of prejudice to the nondefaulting party would not in itself entitle the defaulting party to relief from the judgment").  Parallax will still have the opportunity to be heard on damages.  In short, there is no good cause to vacate the default entered by the Court.

## CONCLUSION

For the foregoing reasons, I recommend that Parallax's motion to vacate the default be denied but that Parallax be given an opportunity to contest the amount of damages sought by EMA.  By March 23, 2022, Parallax shall file a brief of no more than fifteen pages addressing the damages claimed by EMA in its inquest submissions.  By April 6, 2022, EMA may file a reply of no more than ten pages.

## OBJECTIONS AND APPEAL

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules Of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report And Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

Respectfully Submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: February 24, 2022
        New York, New York

Copies transmitted this date to all counsel of record.